# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:08CV77-RLV

|                                          |     |                         |
|------------------------------------------|-----|-------------------------|
| MOOSE, LARRY A.,                         | )   |                         |
|                                          | )   |                         |
|     Plaintiff,       | )   |                         |
|                                          | )   |                         |
|     vs.              | )   | **MEMORANDUM and ORDER** |
|                                          | )   |                         |
| NATIONWIDE MUTUAL INSURANCE              | )   |                         |
| COMPANY, NATIONWIDE MUTUAL               | )   |                         |
| FIRE INSURANCE COMPANY,                  | )   |                         |
| NATIONWIDE LIFE INSURANCE                | )   |                         |
| COMPANY, NATIONWIDE PROPERTY             | )   |                         |
| AND CASUALTY INSURANCE                   | )   |                         |
| COMPANY,                                 | )   |                         |
|                                          | )   |                         |
|     Defendants.      | )   |                         |
| _____ | )   |                         |

**THIS MATTER** is before the Court on Defendant Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, and Nationwide Property and Casualty Insurance Company's ("Nationwide") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. 35), filed March 3, 2010; Plaintiff Larry A. Moose's ("Moose") Response in Opposition (Dkt. 42), filed April 20, 2010; and Defendant's Reply (Dkt. 44), filed April 29, 2010.

## I. PROCEDURAL BACKGROUND

_____This action was commenced in The General Court of Justice, Superior Court Division, for Iredell County, North Carolina on May 28, 2008, by way of a civil summons and complaint filed by Moose claiming Breach of Contract, Tortious Interference with a Contract, and Unfair and Deceptive Trade Practices pursuant to N.C.G.S. § 75-1.1. (Dkt. 1-1, 1-8). The Complaint was

amended in State Court on June 17, 2008. (Dkt. 1-1. 9-14 / First Amended Complaint). Before

further action could be had in State Court, Defendant removed this action to federal court

pursuant to 28 U.S.C. §§ 1441 and 1446. (Dkt. 1, 1-2). This Court has original jurisdiction

pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship between the parties and

because the amount in controversy exceeds the statutory minimum of $75,000.00, exclusive of

interests and costs. (Dkt. 1, 2-4).

On September 3, 2009, Moose moved to amend/correct the amended complaint. (Dkt.

24). This motion was granted by U.S. Magistrate Judge David Keesler on November 10, 2009.

(Dkt. 28). On November 11, 2009, Moose filed a second amended complaint incorporating the

previous claims and adding claims for Fraud, Negligent Misrepresentation, and Constructive

Fraud. (Dkt. 31 / Second Amended Complaint) (leave of court to amend complaint provided by

the magistrate judge on November 10, 2009 / Dkt. 28).  For convenience, additional citations to

the Plaintiff's original Complaint and subsequent amended pleadings will refer simply to these

pleadings collectively as Plaintiff's Complaint.

The facts for the purpose of this Memorandum and Order are as follows.

## II.  FACTUAL BACKGROUND[1]

From approximately 1987 to December 31, 2006, Moose owned and operated an

independent Nationwide Insurance Agency in Statesville, North Carolina. Moose operated the

Larry A. Moose Nationwide Insurance Agency ("the Agency") pursuant to the terms of an

exclusive independent agent's agreement  ("Agent's Agreement") and the internal policies of

---

[1] Unless otherwise noted, the facts are presented in the light most favorable to Moose, the party
opposing the summary judgment motion.

Nationwide as a whole.[2]   The Agent's Agreement provides that Moose's relationship with Nationwide and status is that of an Independent Contractor. (Dkt. 36, Ex. F).

Nationwide's chain of command started with Moose as an independent agent, whose immediate supervisor was Mike Rollins ("Rollins"), a District Sales Manager.   During the relevant time period, Rollins' supervisor was the Sales Director for Western North Carolina, Scott McPherson ("McPherson").[3]   McPherson answered to Michael Kirk ("Kirk"), who was in charge of all North Carolina Nationwide agents.

On direction from McPherson,[4] (Dkt. 42-3, 9)[5], Rollins began speaking with agents in the age range of 60 to 65 years about retirement. Rollins discussed the option of retirement with Moose, (Dkt. 1-1, Ex. A, ¶ 6), who was 62 years old at that time and had intended to continue working until the age of 66.[6] (Dkt. 1-1, Ex. A, 4, ¶ 8). Moose told Rollins that in order for him to retire before the age of 66 he would need an incentive that would enable Moose to cover the mortgage on his house and his daughter's college education. (Dkt. 37-1, Ex. A, pp. 71-72).

---

[2] Excerpts from the relevant Nationwide policies and the Agent's Agreement are recited within the body of the Memorandum and Order.

[3] McPherson was later displaced during corporate restructuring.

[4] Apparently, there was a movement within Nationwide to encourage unproductive agents to retire. (Rollins Dep. 18)  McPherson went so far as to provide Rollins with a list of the agents' birthdays so that those agents approaching the age of retirement could be identified and approached. (Dkt. 42-3, Ex. #3, 9).

[5] Certain page numbers cited in this section refer to the pages assigned by the CM/ECF docketing system rather than the page numbers from the original transcript of the deposition or document submitted.

[6] Moose's original plan contemplated that he would bring on another Nationwide agent, work with that person for five or so years, possibly reduce his own work schedule to a four-day work week, and groom that individual to take over the agency upon Moose's retirement.  (8/21/09 Moose Dep. 63)

Rollins then proposed to Moose that Rollins begin to refer prospective replacement agents to Moose to see if they would be a good fit and to see if a "side deal" could be worked out where the agent taking over would pay Moose $160,000.00, the estimated "incentive to retire."[7] (Dkt. 37-1, Ex. A, pp. 71-72). Moose agreed in principle and the replacement agent search began.

    According to Rollins, he discussed with Moose generally how an agent goes about buying an agency, the loan process, and the various areas within a *pro forma* package.  (Rollins Dep. 111)   Prospective Nationwide owners / agents were required to purchase "the right to take over the agency" from Nationwide.[8]  (Rollins Dep. 24-25)  In addition to purchasing the right to take over an agency, Nationwide had a liquid assets requirement to ensure that an agent had "the bare minimum ... in order to help facilitate their *pro forma* going into ..." an exclusive agent's position.   (Rollins Dep. 85)   Aside from financial considerations, a prospective agent also had to be approved or "passed upon" by each level of Nationwide management.[9]   A Nationwide corporate committee in Columbus, Ohio, comprised of accountants and field agents then made

---

[7] Although Moose refers to the sale of the book of business in the Complaint, for purposes of summary judgment, Moose characterizes the agreement as an "incentive to retire."

[8] The business *pro forma,* which dictated the purchase price, took each product line and renewal premium, made assumptions on new sales, made assumptions on retention, and was given back to the respective candidate for plugging in the numbers of sales, employees, salaries, events, utilities, etc., to represent the *pro forma* based upon the data of that particular agency.  (Rollins Dep. 27-29)  Based on the *pro forma* for the given individual agency, the possibility of three different scenarios then existed for method of payment to Nationwide: 1) the necessity of securing a loan from Nationwide Bank would be completely waived; 2) a portion of the loan would be waived, generally 50%; or  3) maintenance of a contract requiring a certain amount of minimum sales, new sales, new premium overall for a period of two to three years. (Rollins Dep. 28-30) If a prospective agent met certain criteria, the agent would be extended an offer of a loan through Nationwide Bank.  (Rollins Dep. 28)

[9] Moose concedes, however, that the outgoing or retiring agent is more of a consultant during the replacement process and that Nationwide, in fact, retains the ability to reject any replacement candidate. (Moose Dep. 116)

the ultimate decision to extend an exclusive agent contract to a prospective agent.

In June of 2006 Rollins referred Jason Winn ("Winn") to Moose as a potential replacement. (Dkt 42, 7). Moose and his staff met with Winn and generally discussed the take over process but did not discuss the side deal. (Dkt. 37-1, 20-21). In his deposition Moose recounts the evaluation he gave to Rollins following his meeting with Winn:

> And I told him everything went extremely well, I was very impressed. And I thought he would be an excellent fit with my agency . . . And at that time I was concerned – I – I said, "Now, Mike," I said, "Jason doesn't appear to me to be what I would call a rich fellow." And I said, "If he comes to me" - - and I – and I did ask him if he had discussed the arrangement with him. And he said, "Yes, he's – he's aware." And I said, "How is he going to be able to afford to do this? Is he going to go to the bank and get the money, or is he expected to produce this on his own, or exactly how does this work?" And he said – at that point in time he told me that when a new agent is started in the process of taking over an agency there is a budget that is sent in that is developed by the manager and the prospective agent for the business operation expenses . . . . And that budget could be padded to the point that the amount of money I needed would be covered as part of that.

(Dkt. 42-4, 79). At that point, Rollins met with  McPherson who was initially on board with Winn replacing Moose. But in a conversation approximately a week later, McPherson told Rollins that Winn had failed to meet the qualifications for the replacement agent position. Winn went on to become a district sales manager for Nationwide in the Boone, Lenoir, and Wilkesboro areas. (Dkt. 43-3, 22).

At some point in early August, Moose was instructed by Rollins that the screening process of potential new agents required that Moose submit a retirement letter.[10] (Dkt. 42-3, 21). Moose was concerned with taking this step but did so when Rollins assured Moose that the

---

[10] Kirk testified at deposition that submission of a letter of resignation being a "requirement" was not entirely accurate. "We don't need a retirement letter to consider people. We need a retirement letter to approve people." (Dkt. 42-7, 25). He went on to testify that "the only time [a retirement letter is] required is to send the retirement letter to us the day before you retire." (Dkt. 42-7, 25).

resignation letter could be rescinded "up to the very last minute of the whole process." (Dkt. 42-4, 102). Moose submitted his retirement letter as instructed. (Dkt. 42-3, 21).

Next, Rollins referred Bennie Sheally ("Sheally") to Moose as a potential replacement agent. (Dkt 42-3, 21). Sheally began the screening process, meeting with Moose and taking a business acumen test, which he passed. (Dkt. 39-1, 28). It is disputed whether Moose submitted a second retirement letter, but agreed that a retirement letter was on file for Sheally's screening process.[11] McPherson initially rejected Sheally as a candidate, allegedly because of the way he had treated clients in the past.[12] (Dkt. 42-3, 22). Later, McPherson changed his position regarding Sheally, for business purposes, and asked Rollins to attempt to talk Sheally into taking over Moose's agency.[13] (Dkt. 42-3, 22). The attempts by Rollins failed and Sheally went on to take over a Nationwide agency in Wilmington, North Carolina. (Dkt. 42-4, 116).

The third candidate Rollins proposed for replacing Moose was Todd Bowman ("Bowman"). (Dkt. 42-3, 23). Bowman was introduced to Moose in October 2006. Moose was again instructed by Rollins to submit a retirement letter so that the screening process for Bowman could take place. (Dkt. 42-2, 122). Bowman's candidacy proceeded farther along in the

---

[11] According to Rollins, Moose submitted a resignation letter again for Sheally's screening process. (Dkt. 39-1, 26). However, Moose testified at his deposition that he believed his resignation letter submitted on August 6, 2006 was for Winn's candidacy, which remained in effect until Sheally was rejected as a replacement candidate, at which time, Moose withdrew his retirement letter. (Dkt. 42-4, 101-102).

[12] Sheally already served as a Nationwide employee in a corporate position where he did not answer to McPherson or Kirk.

[13] Rollins states that the change in McPherson's position towards Sheally was motivated by a financial interest. Apparently, Sheally had relationships in place that would result in premiums that would regularly be passed on to McPherson, then passed on to Jay Rabon, the Sales director for the Eastern half of North Carolina. (Dkt. 42-3, 22).

replacement process than the previous candidates. Bowman began the screening process by submitting a variety of documents and meeting with both Moose and Rollins. (Dkt. 42-4, Ex. #4, 127-28). Bowman successfully completed Nationwide's Mentee Program for prospective agents. (Bowman Aff. 2) Bowman was told that his candidacy was "on track" and that he was a "shoo-in" to take over the Agency. (Bowman Aff. 2)

Moose and Bowman eventually signed what the parties refer to as "a letter of intent" dated December 5, 2006. (Dkt. 39-7, Ex. H, 2). The letter "confirm[ed] the intent for Larry Moose to sell Todd Bowman the rights and items below" –

> "[T]he right to use the name, Larry A. Moose Insurance Agency, INC, and the office equipment . . . and miscellaneous items for a lump sum of the agreed upon amount paid by February 29, 2006[sic]."[14]

Dkt. 39-7, Ex. H, 2). The letter of intent further provided that Moose would work as a consultant for twenty hours a week for 36 months for an agreed upon monthly consulting fee and that arrangements would be made to split commission on all new business only. (Dkt. 39-7, Ex. H, 2).

Moose submitted another letter of resignation to McPherson on December 6, 2006, effective December 31, 2006. (Dkt. 39-8, 2). Moose was still operating under the belief, based on what Rollins had told him previously, that he could rescind his retirement letter at any point. (Dkt. 42-4, Ex. #4, 123) The next day, December 7, 2006, McPherson sent an email to Rollins which read:

> Please confirm that [Moose] understands that he will not be allowed to rescind this letter once we commit resources to making it occur. Next steps include finalization of the business plan, pro forma development plan. Once we get this done,

---

[14] Although the letter of intent called for payment to be made to Moose by February 29, 2006, it appears to be a typographical error since the letter wasn't reached until December 2006.

we can get together to review.

(Dkt. 42-7, Ex. E, 25-27).

Moose became concerned with the forecast that Bowman's official approval would not take place by the end of the year and expressed this to Rollins. (Dkt. 42-4, 147). On December 22, 2006, Moose sent an official letter to McPherson, on instruction from Rollins, attempting to withdraw his retirement letter, saying that he "would like to reconsider retirement sometime after January 1, 2007."[15] McPherson refused to accept the withdrawal letter and sent the letter to Kirk, who also refused to accept Moose's attempted withdrawal of his retirement. (Dkt. 42-7, 26). Kirk testified that the decision to accept or deny Moose's withdrawal was up to him and he decided to deny it because resources had been committed to finding Moose's replacement.[16] (Dkt. 42-7, 26). Moose testified that after his retirement letter was not allowed to be withdrawn, he was unsuccessful in attempts to contact McPherson and Kirk and was reluctant to go over the heads of his bosses due to the fear of potential repercussions. (Dkt. 37-2, 34).

As a result of Moose's putative retirement and Bowman's pending candidacy as Moose's replacement, the Agency, or former Larry A. Moose Nationwide Insurance Agency that Plaintiff Moose built during approximately twenty (20) years as an exclusive agent with Nationwide, became an "open agency." (Dkt. 37-2, 32-34). As an open agency, the Agency was operated by

---

[15] Rollins told Moose to send the withdrawal letter directly to McPherson "so that there was no question." (Dkt. 42-3, Ex. B, 25). Rollins later met with McPherson concerning the withdrawal letter, at which time, McPherson said that he "wasn't going to send it in" because "he was tired of getting screwed over by agents and he didn't trust Larry. He didn't trust Larry that he would come up and actually resign going forward with [Bowman]...." (Dkt. 42-3, 25). This came as a surprise to Rollins. (Dkt. 42-3, 25).

[16] Kirk sent a letter dated December 21, 2006, thanking Moose for his twenty-three years of service to Nationwide and wishing him the best in his years of retirement. (Dkt. 39-9, 2). Moose did not receive this letter until after the first of the year. (Dkt. 42-4, 147).

Nationwide's Checks and Balances, Inc.[17]   Moose stayed on as an hourly employee.

At the same time, effective January 2007, Nationwide doubled its liquid asset requirement (from $25,000 to $50,000), applicable to all Nationwide agencies and all prospective Nationwide agents.[18] (Dkt. 42-2, 3).  Around March of 2007, nearly three (3) months after Moose's retirement became effective, and three (3) months after the revised liquid asset policy took effect, Bowman was informed that he had not been approved by Nationwide to take over the agency because of the liquid asset requirement increase.  Bowman was advised that he was disqualified because he only had approximately $33,000.00 in liquid assets. (Dkt. 42-4, 3).

Since January of 2007, Moose has been working in the Agency and simultaneously accepting retirement benefits. (Dkt. 37-2, 32-34). Because Moose had entered into a non-compete with Nationwide at the outset of his career, he was contractually obligated not to sell insurance elsewhere.  (Pl.'s Brf. In Opp'n. at 25).

Saundra Carney ("Carney"),  a sibling of two successful Nationwide agents in the area, was awarded the exclusive agency contract to service Moose's former agency.  (Rollins Dep. 89-90)  Carney took over the agency with Nationwide's approval on July 1, 2007.  (Rollins Dep. 90)

---

[17]   The term "open agency" refers to a Nationwide agency operating without the benefit of a contractor to service the rights of the agency.  (Rollins Dep. 81) In that situation, Nationwide would pick up the expenses and manage the agency.  (Id.)  "Checks and Balances, Inc." refers to an employment or staffing tool utilized by Nationwide in open agency situations as reflected in the project staffing agreement between Checks and Balances and Moose. (Moose Dep. / Exh. M).

[18] The liquid assets requirement that was eventually applicable to Bowman entailed $50,000 in liquidity cash.

### III. STANDARD OF REVIEW

Summary judgment is proper where "the facts and the law will reasonably support only one conclusion." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (*quotations omitted*). In determining whether this is the case, a court should examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" to decide if "there is no genuine issue of material fact" such that "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In considering a motion for summary judgment, the court is required to view the facts and inferences in the light most favorable to the party opposing the motion. Anderson, 477 U.S. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). The Court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000); see also Anderson, 477 U.S. at 255 (noting that "[c]redibility determinations, the weighing of the evidence, and drawing of legitimate inferences from the facts are jury functions, not those of the judge.").

However, the party opposing summary judgment "may not rest upon the mere allegations or denials of [his or her] pleadings," FED. R. CIV. P. 56(e), and a "mere scintilla of evidence" is insufficient to overcome summary judgment. Anderson, 477 U.S. at 249-50. Instead, the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue

for trial." FED. R. CIV. P. 56(e).

## IV. ANALYSIS

Summary judgment is inappropriate because genuine issues of material fact exist

regarding 1) formation of contract between Moose and Nationwide / Rollins; 2) the extent of

Mike Rollins' actual (implied) and apparent authority; 3) representations made to Moose by

Rollins regarding the replacement agent search process, proposed "side deal," and Moose's

ability to rescind his retirement letter prior to approval of a replacement agent and / or prior to

Moose's effective retirement date; and 4) whether Moose reasonably relied on Rollins'

representations.

**A.      Breach of Contract**

Moose contends that he entered into a valid and enforceable contract with Nationwide.

According to Moose,  in exchange for his early retirement, Rollins, on behalf of Nationwide,

promised to help identify a replacement agent willing to enter into a side deal with Moose

covering the desired $160,000.00 retirement incentive.  The gist of Moose's breach of contract

claim is that Nationwide breached this contract by failing to approve Bowman as a replacement

agent while enforcing Moose's letter of retirement.

Moose contends that he and Rollins first discussed his financial goals and retirement

plans in late 2005 or early 2006, at which time Moose made clear that he would not be able to

retire until his house was paid for and his daughter's college education was taken care of. (Moose

Dep. 63-72)  According to Moose, absent an additional financial incentive to do so (*i.e.*, a "side

deal"), there was no reason for him to retire since he could stay on and continue to collect his

renewals and new sales commissions.  (Moose Dep. 82)  According to Moose, he only responded

11

positively to the inquiry about retirement when prompted by Rollins, "Well, I have candidates that I can send to you. And if we can make that happen for you, get those things taken care of, would you retire?" (Moose Dep. 63) (Moose Dep. 63)

Rollins denies ever representing to Moose that he'd find a replacement agent who would pay Moose "some lump sum" of money to cover the financial obligations Moose identified as obstacles to early retirement. (Rollins Dep. 110) Instead, Rollins claims he had in his mind that the replacement agent would permit Moose "to work through a transition," possibly on a part-time basis, and enable him to continue to earn some money. (Rollins Dep. 109) (Rollins Dep. 109-11, 117-18) Nationwide argues that Moose's breach of contract claim fails because 1) no such contract could exist since Rollins lacked the actual and apparent authority to contract on behalf of Nationwide; and 2) that even if Rollins possessed the requisite authority and a contract found to exist, the contract would be unenforceable as a matter of law due to either impossibility of performance or because its terms violate public policy. Taking the facts and inferences in the light most favorable to Moose, genuine issues of material fact exist as to whether Nationwide, through Rollins, entered into a valid and enforceable contract with Moose.

**i.**

A valid contract may be formed by the agent of the principal where "[1] the agent acts within the scope of his [] authority; [2] when an unauthorized contract has been ratified; or [3] when the agent acts within the scope of his [] apparent authority, unless the third person has notice that the agent is exceeding actual authority." Branch v. High Rock Realty Inc., 565 S.E.2d 248, 252 (N.C. App. 2002). "Actual authority is that authority which the agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care by the principal." Harris

v. Ray Johnson Constr. Co., 534 S.E.2d 653, 655 (N.C. App. 2000). Actual authority may be implied by conduct of the principal amounting to consent or acquiescence. Lucas v. Little General Stores, 221 S.E.2d 257, 262 (1976).

Under the doctrine of apparent authority, "the principal's liability is to be determined by what authority a person in the exercise of reasonable care was justified in believing the principal conferred upon his agent." Branch, 565 S.E.2d at 252. "[A]ny apparent authority that might otherwise exist vanishes in the presence of the third person's knowledge, actual or constructive, of what the agent is, and what he is not, empowered to do for his principal." Id.

What Moose reasonably believed to be Rollins' actual or apparent authority is a matter for the jury. Here, Rollins was Moose's immediate supervisor, and the only Nationwide manager with whom Moose had significant contact. Moose trusted Rollins and believed Rollins to be a man of his word. (8/21/09 Moose Dep. 172) Indeed, as far as Moose was concerned, "Mike Rollins was the voice of Nationwide ...." (Dkt. 42-4, 174)

Nationwide contends that because Moose was aware of Nationwide's written and express policy against side deals, any argument by Moose in support of Rollins' actual or apparent authority fails. Nationwide's policy concerning succession planning addresses the financial arrangements involving transfer of business between Nationwide Agents as follows:

> "Under no circumstances, either in agency succession or merger situations, will Nationwide condone or permit financial arrangements between agents involving the transfer of Nationwide policies."

(Def.'s Exh. G / Nationwide Agency Succession Planning Policy). Similarly, Nationwide's Agency Administration Handbook provides in pertinent part:

> It is entirely up to the company to reassign cancelled agent business, ***with no***

> ***financial considerations payable to the cancelled agent from any source other than those provided by the Agent's Security Compensation benefits***....

(Def's Exh. F / Nationwide Agency Administration Handbook at 1) (*emphasis provided*).

Whether Moose exercised reasonable care is likewise for the jury. The extent of Moose's knowledge, if any, of the written policies is disputed. Moose testified that he was unfamiliar with Nationwide's Succession Planning Policy, which had only been in existence since 2003, and that Rollins never advised or otherwise informed him about the succession policy. (Moose Dep. 99) Moose testified that the existing procedure for screening a prospective Nationwide agent, including the candidate's provision of certain start-up fees, is "a new process, not part of what [Moose] was involved with early on in [his] career." (Moose Dep. 78)

Notwithstanding the more recent written policy, Moose had knowledge, dating back to 1995, of "side deals" taking place among agents and replacements within Nationwide. (Dkt. 42-4, 84-85 / Moose Dep. 72). Significantly, Moose's understanding was that the sales managers, like Rollins, were active participants in the "side deal" process. (Moose Dep. 135)

Todd Bowman's affidavit supports Moose's position. According to Bowman, Moose and Bowman had reached a "side deal" that was discussed in a meeting between Moose, Rollins, and Bowman. (Dkt. 42-2, 2). The deal provided that, if approved to take over the agency, Bowman would pay Moose $100,000.00 to be paid over the course of the first couple years of operating the agency.[19] (Dkt. 42-2, 2). Bowman further testified that he received encouragement from both Rollins and McPherson that his approval was on track and that, if necessary, Moose would be

---

[19] Bowman addresses the discrepancy in the amount to be paid from $160,000.00 to $100,000.00: "I understand that Larry believes the agreed upon amount was $160,000.00 and he may be right, but my recollection is that the amount was $100,000.00." (Dkt. 42-4, 3).

able to rescind and resubmit his resignation letter at a later date. (Dkt. 42-2, 2-3).

Aside from evidence concerning the proposed Moose / Bowman transaction, Moose proffers an affidavit from Troy McMahon ("McMahon"), former independent Nationwide agent who owned and operated a Nationwide agency in Matthews, North Carolina prior to retirement.[20] (McMahon Aff. 1)  McMahon avers:

> I entered into [a] "side deal" with [his replacement] whereas he paid me $150,000.00 for the agency.  We entered into this "side deal" openly and I am satisfied that the officials of Nationwide involved in approving [my replacement] to take over my company were aware of our "side deal".

(McMahon Aff. 1)   McMahon further states that "[t]o the best of [his] recollection, [he] was never required by Nationwide to submit [his] resignation until [his replacement] had been approved to take over [the] agency."  (Id.)

There is also evidence that during the same time period another Nationwide agent, Robert Tarlton ("Tarlton"), with Rollins' assistance and expertise, reached a side deal worth $100,000.00 with the agent that replaced him upon retirement. (Tarlton Dep. 26, 47)  Tarlton operated a Nationwide agency in Taylorsville, North Carolina, approximately 20 miles away from Statesville, North Carolina.  According to Tarlton, every candidate Rollins sent to him knew of the proposed side deal or financial incentive to retire before meeting with him.  (Tarlton Dep. 35) When asked about any prohibition regarding side deals between the owner / operator and replacement agent, Rollins testified that "[t]here was no written policy."[21]  (Rollins Dep. 47-

---

[20] There's a discrepancy as to the year of McMahon's retirement within the affidavit.  McMahon initially states that he retired in August 2000 yet states immediately below the reference to 2000 that he retired in August, 2006.

[21] In fact, according to Tarlton, Rollins instructed him not to report the money to the Internal Revenue Service.  (Tarlton Dep. 37)

48)

Finally, whether Nationwide took the past of least resistance and acquiesced is for the jury. While the parties agree that Nationwide's "official word" was that side deals were not permitted, a jury could reasonably find that "side deals" were entered into with tacit approval or acquiesence by Rollins or other members of Nationwide's upper management.[22] (Kirk Dep. 94) With respect to contracts between outgoing agents and prospective agents, the practice at Nationwide was to simply look the other way. (Rollins Dep. 113, 117-18) Nationwide instructed its employees "not to get involved under any circumstances with anything other than what was policy." (Rollins Dep. 48) Similarly, Michael Kirk testified that he heard about financial arrangements between new agents and retiring agents in the course of his work:

> "I took the position [] that – that we never got involved in that and had given very distinct and clear directions to sales managers that if any of that was taking place that, you know, we're not supportive of it and that I would not ever approve of it."

(Kirk Dep. 42) Kirk concedes that he never took any affirmative steps to prevent an outgoing agent from contracting with a prospective replacement agent but denied that Nationwide would condition acceptance of an agent's retirement upon replacement with a specific prospective agent (Kirk Dep. 41-44)

Taking these facts in the light most favorable to Moose, a reasonable jury could come to the conclusion, Anderson, 477 U.S. at 248, that Rollins reasonably thought he possessed the authority to enter into such a deal due to want of ordinary care by Nationwide, Ray Johnson Constr. Co., 534 S.E.2d at 655, or acquiescence, as the evidence tends to show other side deals

---

[22] After corporate restructuring, McPherson himself was a proposed party-offeror in one instance where he attempted to purchase the right to service a retiring agent's agency. McPherson offered a deed to his house as collateral for a $100,000.00 payment for Tarlton's agency. (Dkt. 42-8, 61).

taking place among agents and an environment conducive to financial "side deals" between

retiring agents and incoming agents. Alternatively, a reasonable jury could come to the

conclusion, <u>Anderson</u>, 477 U.S. at 248, that Moose, exercising reasonable care, was justified in

believing that Rollins had the apparent authority to enter into an agreement providing a side deal.

<u>Branch</u>, 565 S.E.2d at 252.

**ii.**

Nationwide next argues that even if Rollins possessed the authority to contract on its

behalf, the  terms of the alleged agreement would be unenforceable as a matter of law.  More

specifically, Nationwide argues that the side deal between Rollins and Moose was a *de facto*

agreement to sell Moose's book of business.  Nationwide argues that, pursuant to the Policy

Ownership section within its Agency Administration Handbook, the book of business was owned

by Nationwide and was not Moose's to sell.  Nationwide's position regarding Policy Ownership

is as follows:

> The interest of the policyholders, agents, employees, and the public are
> best served through policyholder ownership and control of the business.  Such
> control helps to develop and maintain financial soundness of the Companies and
> provide high quality insurance service at the lowest possible cost.  It is, therefore,
> a policy that the policyholders, through the Companies, shall maintain ownership
> and control of the business and all policyholder information and such ownership
> rights shall not be vested with either agents or employees.
> Nationwide retains the exclusive right to continue to provide insurance
> services to any and all customers.  The Companies also have the exclusive right to
> assign the business.  ***Agents have no ownership of the book of business and have
> no transferable interest that they can sell to another agent or entity***....

(Def.'s Exh. F / Agency Administration Handbook at 1).  According to Nationwide's express

policy, agents such as Moose have no ownership interest in the book of business.  (Rollins Dep.

101) Rather, Nationwide posits that outgoing agents with the requisite years of service are entitled to "extended earnings" and any deferred compensation accrued during employment.[23] (Rollins Dep. 101)  Consequently, any promise allegedly made by Moose to sell the book of business representative of his independent insurance agency would be impossible to accomplish (and his performance frustrated) given that Moose did not possess any ownership interest in the book of business to sell.

On its face, the letter of intent describing the side deal makes no mention of the book of business. (Dkt. 39, #7 Ex. H) ("Buying the right to use the name of Larry A. Moose Insurance Agency, INC and the office equipment . . . and miscellaneous items.").  In addition, Rollins testified that a contract between Moose and Bowman for the right to use the same office space, the use of the existing agency name, and the sale of office equipment would be entirely proper and consistent with Nationwide policies.  (Rollins Dep. 100-01)

Nationwide argues as well that the purported contract terms advanced by Moose would be unenforceable because the manner in which the side deal would be funded would have resulted in misrepresentations, and the potential commission of fraud, upon Nationwide.  Moose contends that the details of funding the side deal were left to Rollins and the replacement agent.   In fact, the whole idea of padding the *pro forma* was first suggested by Rollins.  Although Moose admittedly contemplated the possibility of an unorthodox funding arrangement that would inure to his benefit, Nationwide fails to reconcile its claim with Bowman's affidavit. Bowman

---

[23]   The method for calculating extended earnings is set forth in detail within Nationwide's Agent's Agreement.  (Agent's Agreement, ¶11) Rollins testified that extended earnings for an eligible agent typically amounted to "one times the previous 12 months renewals for all property and casualty products."  (Rollins Dep. 101)

describes a legitimate manner of payment in which the funding to pay Moose is drawn from the income Bowman would receive in the first years of operating the agency. (Dkt. 42-2,3). At minimum, the representations made by Moose and Bowman create a genuine issue of material fact.

For all of these reasons, summary judgment is not proper on Moose's breach of contract claim. Similarly, because Plaintiff's other causes of action are at least partially dependent upon the breach of contract claim (and the facts ultimately to be determined by a jury), summary judgment disposition cannot be had on the remaining claims.

**B.      Tortious Interference[24]**

Moose contends that the series of rejected prospective replacement agents (Winn, Sheally, Bowman) was motivated by Nationwide's desire to force Moose into retirement. In other words, Moose's tortious interference claim is based on the alleged malicious and arbitrary deterring of replacement agents from entering into contracts with Moose by Nationwide. Moose contends that, but for Nationwide's interference, one or more of the potential replacement agents would have entered into a contract with him. According to Moose, he was deprived the benefit of a side deal and was unable to reap the benefits flowing out of the Agency while Nationwide

---

[24] Nationwide argues that Moose fails to establish a successful tortious interference with contract claim because Moose did not have an enforceable contract with any potential replacement agent. Moose admits that the agreement between him and Bowman was subject to the condition precedent of Bowman being approved as the replacement agent and was likely not binding. (Dkt. 37-2, Moose Dep. 25, 28-29). This condition precedent never occurred; therefore only an executory contract or inchoate set of rights ever existed between Moose and Bowman. *See* Chemical Realty Corp. v. Home Federal Sav. and Loan Ass'n of Hollywood, 351 S.E.2d 786, 792 (N.C. App. 1987) (*quoting* Tire Co. v. Morefield, 241 S.E.2d 353 (N.C.App. 1978)) ("A condition precedent is a fact or event, 'occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.").

sustained a windfall.[25]

As an initial matter, the Court rejects Nationwide's contention that Moose did not plead tortious interference with prospective economic advantage. Although the Second Claim for Relief is labeled "Tortious Interference With A Contract," the language within the body of the Complaint clearly speaks to plural prospective contracts. (Compl. ¶¶25, 26) ("deterring potential agents from entering into a contract ... which they would have entered into ..." and interference that "dissuaded potential agents ....") Moreover, courts have recognized that different specific theories of tortious interference may be encompassed within the "tortious interference" or "tortious interference with business relations" category.

In order to prevail on a tortious interference with prospective economic advantage claim, there must be proof that "defendants acted without justification in inducing a third party to refrain from entering a contract with them which would have ensued but for the interference." Gupton, 695 S.E.2d at 770 (citing Walker v. Sloan, 529 S.E.2d 236, 242 (N.C. 2000)). "[T]he general rule prevails that unlawful interference with the freedom of contract is actionable whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant's own rights, but with design to injure the plaintiff, or gaining some advantage at his expense." Id. (quoting Coleman v. Whisnant, 35 S.E.2d 647, 656 (1945)).

"[I]nterference with contract is justified if it is motivated by a legitimate business

---

[25] Moose contends that the replacement agent, Saundra Carney, was required to pay Nationwide 150% of the renewal premiums from the previous years for the right to the agency and that the payment was a financial benefit to Nationwide. (Rollins Dep. 25) Nationwide Bank also received business by loaning Carney the money to acquire the agency and charging an interest rate. (Pl.'s Brf. In Opp'n. 20)

purpose." Gupton v. Son-Lan Development Co., Inc., 695 S.E.2d 763, 770 (N.C. App. 2010)

(*quoting* Sellers v. Morton, 661 S.E.2d 915, 921 (2008)). "Justification depends upon 'the

circumstances surrounding the interference, [its] motive or conduct, the interests sought to be

advanced, the social interest in protecting the freedom of action ..., and the contractual interests

of the other party.'" Francis v. Power Plant Maintenance, Inc., 264 F.Supp.2d 350, 355

(M.D.N.C. May 22, 2003) (interference is not justified if act is done other than as a reasonable

and bona fide attempt to protect legitimate interest) (*quoting* Peoples Sec. Life Ins. Co. v. Hooks,

367 S.E.2d 647, 650 (1988))

Nationwide argues that it did not induce Bowman to not perform under the alleged

contract. However, Nationwide didn't need to induce Bowman because it thwarted his

performance with its determination that Bowman was ineligible to take over the Agency.

Nationwide also contends that its disqualification of Bowman as a replacement agent was

justified because Bowman could not meet Nationwide's liquid asset requirement of $50,000.00.

(Dkt. 36, 16-17). Because genuine issues of material fact are attendant to these claims, Moose's

tortious interference claim survives summary judgment.

## C.    Fraud, Negligent Misrepresentation, Constructive Fraud

The same can be said for Moose's other tort claims. In order to successfully prosecute his

action for fraud, Moose must show evidence of: "1) [a] false representation or concealment of a

material fact [by Nationwide]; 2) reasonably calculated to deceive; 3) made with intent to

deceive; 4) which does in fact deceive; 5) resulting in damage to the injured party." Jordan v.

Crew, 482 S.E.2d 735, 739 (N.C. App.1997).

On the other hand, negligent misrepresentation requires a litigant to show that he

"justifiably reli[ed] to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Hunter v. Guardian of Life Ins. Co. of Am., 593 S.E.2d 595, 600 (N.C.App. 2004).

Constructive fraud is shown by evidence of: 1) a relationship of trust and confidence; and 2) use of the relationship to the detriment of the plaintiff and benefit of the defendant. *See* Rhodes v. Jones, 61 S.E.2d 725, 726 (N.C. 1950). More recent North Carolina caselaw equates constructive fraud with a breach of fiduciary duty. *See e.g.,* Greene v. Rogers Realty & Auction Co., 586 S.E.2d 278, 280 (N.C.App. 2003).[26]

In contrast to a claim of fraud, constructive fraud does not require proof of an intent to deceive by the defendant. Jay Group, Ltd. v. Glasgow, 534 S.E.2d 233, 236 (2000). Plaintiff must still show that he or she was deceived. Id.

 As to the fraud, negligent misrepresentation, and constructive fraud claims, Nationwide contends that each of these respective claims are founded on Moose's allegation that Nationwide, through Rollins, induced him to submit, and guaranteed him the ability to rescind, his December 6, 2006 retirement letter. Nationwide argues that Moose personally concedes the falsity of this claim. (Dkt. 36, 19-21). Nationwide proffers the following excerpt from Moose's deposition:

Q. Okay. So – so when you – so back in August of '06, that – that's the one time that Mr. Rollins told you that you would be able to rescind your resignation?

A. That is correct.

Q. All right. And he said at anytime?

---

[26] A fiduciary duty exists "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Abbitt v. Gregory, 160 S.E. 896, 906 (N.C. 1931).

A. At anytime up to the last day.

Q. Did he say anything about – he said up to – he said you could rescind it up to the last day?

A. Absolutely.

Q. But you knew at that time that Mr. Rollins' authority was – was limited in terms of having to report and get approval from Scott McPherson?

A. About what?

Q. About replacement agents, about retirements.

A. Well, I knew that Scott was Mike's boss and could overrule him. But Mike assured me that that would not vary, that there would be no problem.

Q. But that – was the only time that Mr. Rollins said anything to you about the ability – your ability to rescind the – notice of retirement?

A. That's correct.

Q. Was some time in early August?

A. Yes, before I faxed in the first one because I was very concerned about that.

Q. Okay. Did – and he didn't say anything to you – and – specifically about your ability to rescind your resignation in connection with the – the Todd Bowman candidacy?

A. He never changed anything, no

Q. But he didn't say – he didn't make any representation to you about your ability to rescind it with regard to the Todd Bowman case?

A. No.

Q. You said no, but my statement is correct; is that right?

A. I'm sorry yes.

Q. It's – it's correct to say that Mr. Rollins didn't say anything to you about your ability to rescind your resignation with regard to the Todd Bowman candidacy?

A. That's correct. That's correct.

(Dkt. 38-1, #1 Ex. B, 17-19). Additionally, Nationwide contends that even if Rollins represented to Moose that he could rescind his retirement at anytime, Moose knew that Rollins did not have the authority to make such a promise.[27] Nationwide again cites testimony by Moose in support:

> Q. But you – in – in December, you under – it was your understanding that – that Mike Rollins – that the issue of accepting or – or – or rejecting your recession of retirement was up to Scott McPherson; is that right?
>
> A. Yea. Well, he was the only one mentioned at the time, yes. I knew through Mike Rollins that you first, you know, go through Mike, and he turns it over to Scott. And I really didn't know the process from then on because that was the only name mentioned to me beyond that or at that point.
>
> Q. Was Scott McPherson?
>
> A. I'm sorry – yes. Scott – well, Scott McPherson, yes.

(Dkt. 38-1, #1 Ex. B, 10-11).

The representations made by Rollins, if any, as well as the nature and purpose of each, present questions of fact for the jury. Rollins' statement to Moose, allowing rescission of the first retirement letter, was not accompanied by any qualifiers limiting rescission of the retirement letter only to Winn's candidacy. At the outset of the replacement agent search, Moose expressed reservations in submitting the letter prior to having a replacement agent and side deal finalized. According to Moose's testimony, he was assured by Rollins that he had the ability to rescind his retirement letter. Later, during the pendency of Bowman's candidacy, Rollins did not expressly say to Moose that his retirement letter was rescindable from the present to infinity. However, Rollins did not expressly say to Moose that his retirement letter for Bowman's candidacy would

---

[27] As discussed earlier, genuine issues of material fact exist concerning the extent of Rollins' actual and apparent authority.

be operating under different guidelines than previously agreed upon either. With no conversation between Moose and Rollins regarding Moose's ability to rescind his December 6, 2007 retirement letter, a jury could reasonably conclude that the subsequent retirement letter would be subject to the same conditions promised earlier.

Bowman's affidavit is consistent with Moose's recollection and supports Moose's understanding that his retirement letter was of a tentative nature, subject to the approval of Bowman's takeover of the Agency. Bowman avers that on two different occasions Rollins told Bowman[28] that Moose would be able to rescind his retirement letter "at any time." (Dkt. 42-2, #2 Ex. A, 1). Similarly, Tarlton was required to submit a letter of resignation but was told by Rollins that he could rescind or withdraw it within 60 days. In fact, Tarlton was allowed to withdraw his resignation letter a total of 6 times, including last-minute requests made after everything was approved for his replacement and a request to withdraw considered by McPherson *on the same day Moose's withdrawal was not accepted*. (Tarlton Dep. 38, 52)

Whether Moose was induced to retire early to his detriment and Nationwide's benefit is also for the jury. Moose testified that he was never told that Nationwide had the power to accept or reject his offer of retirement. (Dkt. 42-4, Ex. C, 103-105). Moose testified that he recognized that superiors existed that Rollins answered to, but Moose also testified that he "knew that Scott was Mike's boss and could overrule him. But Mike assured me that that would not vary, that there would be no problem."(Dkt. 38-1, #1 Ex. B, 18). Although Moose does state in his deposition that he knew the decision of accepting or rejecting the rescission of his retirement was

---

[28] Bowman testified that on one of these occasions, Moose was present when Rollins said the retirement letter could be rescinded.

up to McPherson, Moose immediately goes on to say that he was not sure of the process from that point forward. Taken in the light most favorable to the Plaintiff, the evidentiary record presents genuine issues of material fact best suited for the trier-of-fact.

This Court denies summary judgment as to Moose's fraud, negligent misrepresentation, and constructive fraud claims, because genuine issues of material fact exist as to whether Moose was induced into retirement per Nationwide's negligent or fraudulent representations.

D.     **Unfair and Deceptive Trade Practices**

"[A] successful claim under N.C.G.S. § 75-1.1 requires proof of three elements: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to the claimant." Durling v. King, 554 S.E.2d 1, 4 (N.C. App. 2001) (employer-employee context); N.C. GEN. STAT. § 75-1.1. In the context of employee-employer relationships,

> [t]he primary purpose of G.S. § 75-1.1 is to provide a private cause of action for consumers. Although commerce is defined broadly . . . the fundamental purpose of G.S. § 75-1.1 is to protect the consuming public. Thus, the statute usually is not applicable to employment disputes. Nonetheless, the mere existence of an employer-employee relationship does not in and of itself serve to exclude a party from pursuing an unfair trade or practice claim. The proper inquiry is not whether a contractual relationship existed between the parties, but rather whether the defendant's allegedly deceptive acts *affected* commerce. What is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace.

King, 146 N.C. App. at 488-89, 554 S.E.2d at 4 (*citations and quotations omitted*).

Nationwide argues that if the UDTP claim is permitted, the claim fails on two of the three elements required for a successful UDTP claim: (1) the alleged actions were not in or affecting commerce; and (2) even if Nationwide's action are considered to be in or affecting commerce,

Nationwide did not commit an unfair or deceptive act or practice. (Dkt. 36, 21-22). At this stage of the litigation, the undersigned rejects both of Nationwide's contentions.

The "in or affecting commerce" criteria for purposes of a claim pursuant to §75-1.1 is easily met. All that is required is that plaintiff show some business activity and impact on the marketplace. Shepard v. Bonita Vista Properties, L.P., 664 S.E.2d 388, 395 (N.C.App. Aug 5, 2008) ("Commerce means any business activity ...."); Jennings Glass Co., Inc. v. Brummer, 362 S.E.2d 578, 583-84 (N.C.App. 1987) ("The facts which give rise to a Chapter 75 claim necessarily depend on ...the impact the act(s) or practice(s) has on the marketplace."). In addition, "[t]he statute protects not only individual consumers, but businesses as well." Jennings Glass Co., Inc., 362 S.E.2d at 583 (*internal citations omitted*). Because the events at issue concern the activities of an insurance agency, including the book of business and retention of Nationwide clients (the insured individuals or entities), the marketplace was certainly affected.

Moreover, the nature of the allegations here, if proven, could support an unfair or deceptive act or practice claim. Although a mere breach of contract, even if intentional, is insufficient to support an UDTP claim, "if the breach is surrounded by substantial aggravating circumstances, it may sustain an action for UDTP." Griffith v. Glen Wood Co., 646 S.E.2d 550, 558 (N.C. App. 1992) (citing Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. App. 1992), rev. denied, 421 S.E.2d 350 (N.C. 1992)). Fraud allegations are "substantial aggravating circumstances," which may provide the basis for a UDTP claim in contract-centered litigation. *See* Bhatti, 400 S.E.2d at 443 (holding that "a plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred"); Gress v. Rowboat Co., 661 S.E.2d 278, 283 (N.C. App. 2008) (allegation of fraudulent scheme of misrepresentations made to induce the

defendants to enter an agreement was sufficient to survive the plaintiff's Rule 12(b)(6) motion to dismiss a UDTP counterclaim).

Likewise, "[p]roof of fraud [] necessarily constitute[s] a violation of the prohibition against unfair and deceptive acts." Hardy v. Toler, 218 S.E.2d 342, 346 (N.C. 1975); Willen v. Hewson, 622 S.E.2d 187 (2005)(*same*).

**E.        Contract-Centered Dispute**

Because of the "contractual center" of the dispute, Nationwide contends that Moose's tort claims and UDTPA claim should be dismissed. Nationwide's argument cites to Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1988), which states: "In recognition of the fundamental difference between tort and contract claims, and in order to keep open-ended tort damages from distorting contractual relations, North Carolina has recognized an 'independent tort' arising out of breach of contract only in 'carefully circumscribed' circumstances." Broussard, 155 F.3d at 346-47 (*citations omitted*).  As discussed briefly, *infra*, Broussard does not apply as broadly as Nationwide attempts to stretch it.   In Broussard, the Fourth Circuit sought to avoid providing juries the opportunity to venture outside the well-defined remedy of contract damages and into the amorphous realm of tort, that provides a blank check in recovery, in cases that are limited to the interpretation of a contract as it relates to the parties. Id. at 346. Allowing such claims would "turn every potential contractual relationship into a riskier proposition." Id. The Fourth Circuit summarized Broussard this way:

> At bottom then, this lawsuit centers on a dispute between Meineke and its franchisees over the interpretation of different [Franchise and Trademark Agreements] and over Meineke's performance under those [Franchise and Trademark Agreements].This is a straightforward contract dispute, yet it somehow managed to become a massive tort action in the end.

Id. at 345. This Court attempts, to no avail, to boil down the present causes of action to a single sentence as was done in Broussard. Moose claims an identifiable breach of contract action arising out of Rollins' authority to enter a contract on behalf of Nationwide; additionally Moose claims separate and distinct causes of action arising out of Moose's submission of a retirement letter which he alleges was brought about by negligent misrepresentations and fraudulent inducement on behalf of Nationwide. Because the material facts at issue in this case are not limited to the basic interpretation of the terms of a contract, summary judgment is denied.

F.      **Quasi-Estoppel**

Nationwide also argues that Moose is estopped, under the doctrine of quasi-estoppel, from making the claim that he was forced into retirement, because Moose has been voluntarily receiving and accepting retirement benefits since January 1, 2007. (Dkt. 36, 24). Nationwide contends that all of Moose's claims are based on his forced retirement, and because Moose is estopped from making the claim he was forced into retirement, all of his claims should be dismissed.

North Carolina recognizes the doctrine of "estoppel by the acceptance of benefits," also referred to as "quasi-estoppel." Carolina Medicorp, Inc. v. Board of Trustees of State of N.C. Teachers' and State Employees' Comprehensive Medical Plan, 118 N.C. App. 485, 492, 456 S.E.2d 116, 120 (Ct. App. 1995) (citing Brooks v. Hackney, 329 N.C. 166, 172 n.3, 404 S.E.2d 854, 858 n. 3 (1991)). "Quasi-estoppel has its basis in acceptance of benefits and provides that where one having the right to accept or reject a transaction or instrument takes and retains benefits thereunder, he ratifies it, and cannot avoid its obligation or effect by taking a position inconsistent with it." Id. (*citations and quotations omitted*).

North Carolina's doctrine of quasi-estoppel requires that, for a party to prevail under the doctrine, they must show that the party being estopped 1) had the right to accept or reject a transaction or instrument; 2) has subsequently accepted and retained benefits flowing from the accepted transaction or instrument; and 3) now attempts to avoid the obligations that came with the accepted transaction or instrument. Nationwide makes much of the fact that Moose has accepted benefits under retirement, but fails to make a clear showing that Moose had the right to accept or reject retirement in the first place. Nationwide is correct; this issue of forced retirement is the crux of Moose's claims. This Court finds that genuine issues of material fact exist. Moose had the choice of submitting a retirement letter or not, and chose to do so, under Rollins' direction, with the belief that he could rescind this letter at any time. When Moose attempted to rescind, Nationwide refused to accept. Moose claims that he accepted monthly retirement benefits after January 1, 2007, because his resignation had been rejected and there were no other options for viable income that would allow him to pay his bills. (Dkt. 42-4, 160-161). At the very least, these facts taken in the light most favorable to Moose, <u>Anderson</u>, 477 U.S. at 255, present a genuine issue of material fact as to whether Moose had the right to accept or reject the "document or instrument." <u>Carolinas Medicorp Inc.</u>, 118 N.C. App. at 492, 456 S.E.2d at 120.

This Court denies summary judgment because a genuine issue of material fact exists regarding whether Moose had the right to accept or reject retirement.

## V. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Nationwide's Motion for Summary Judgment is hereby **DENIED**. Accordingly, this matter is scheduled for **JURY TRIAL** during the November 2011 Trial Term in the Statesville Division, with Calendar Call on **Monday, November 7, 2011 at 10:00 a.m.** and Jury Selection on **Tuesday, November 8, 2011 at 9:30 a.m.**

Signed: September 19, 2011

Richard L. Voorhees
United States District Judge